UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN M. GARDNER, an individual,<br><br>              Plaintiff,<br><br>v.<br><br>CAFEPRESS INC., a Delaware Corporation; BEVERLY TEALL, an indvidual,<br><br>              Defendants. | Case No. 3:13-cv-1108-GPC-JMA<br><br>**ORDER DENYING DEFENDANT CAFEPRESS INC.'S MOTION FOR SUMMARY JUDGMENT AND GRANTING CAFEPRESS INC.'S ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**(ECF NO. 15)** |

**INTRODUCTION**

Before the Court in this copyright infringement case is defendant CafePress Inc.'s (CafePress) Motion for Summary Judgment (Motion) or, Alternatively, Motion for Partial Summary Judgment (Alternative Motion). (ECF No. 15.) In its Motion, CafePress asserts summary judgment should be granted in its favor because its allegedly infringing conduct falls within the safe harbor set forth in 17 U.S.C. § 512(c) that protects internet service providers from copyright infringement liability under certain circumstances. In its Alternative Motion, CafePress asserts partial summary judgment should be granted in its favor on the issue of whether Plaintiff is entitled to statutory damages and attorney fees.

Plaintiff has filed an opposition to CafePress's Motion, including a request for

additional discovery under Federal Rule of Civil Procedure 56(d). (ECF No. 46.) CafePress has filed a reply in support of its Motion and Alternative Motion. (ECF No. 44.) The Court finds CafePress's Motion and Alternative Motion suitable for disposition without oral argument. See CivLR 7.1.d.1. Having considered the parties' submissions, the Court will **DENY** CafePress's Motion and **GRANT** CafePress's Alternative Motion.

## BACKGROUND

CafePress is an e-commerce vendor that operates an internet website at www.cafepress.com. (ECF No. 15-4, Moore Decl. ¶ 4.) CafePress allows individuals to upload images of their artwork, slogans, and designs for printing on items such as shirts, bags, and mugs. (See id.) While CafePress may decide to remove images, CafePress does not choose which images are uploaded. Rather, images are uploaded at the direction of CafePress users and are stored on servers through CafePress's website. (Id. ¶ 9.) The process for uploading images is automated, meaning that no individual sees or approves images before or while they are uploaded and that images may be automatically formatted "to reduce image compression effects" or automatically scaled "so they print properly on a product." (Id. ¶ 8.) Plaintiff has offered evidence that, when uploading images to CafePress's website, metadata regarding the image's copyright information is deleted. (ECF No. 32.)

Once images are uploaded, they may be printed onto products and sold in at least three ways. First, products may be sold from a user's own virtual shop established through CafePress's website. (See Moore Decl. ¶ 4.) Users may establish two types of virtual shops at no charge or a third type of virtual shop, called a "premium shop," for a fee. (ECF No. 47-7 at 2-3.)

Second, users may make products in their virtual shops "eligible for placement in the CafePress Marketplace." (Id. at 1.) In fact, users' products are automatically placed in the Marketplace unless users opt out of such placement. (Id. at 1.) Still, "CafePress in its sole and absolute discretion . . . determine[s] what designs and

1  products will be available through the CafePress Marketplace." (Id.) If products are
2  made eligible for the Marketplace, "CafePress may automatically modify designs (e.g.,
3  cleaning up JPG artifacting, adjusting colors for different printers and products, and
4  adjusting design placement on products)." (Id.) CafePress also determines the retail
5  price for products sold in its Marketplace. (Id.) If online shoppers want to buy an item
6  from the Marketplace, they pay CafePress directly, (id.), then CafePress pays a 5-10%
7  commission to the user from whose virtual store the product came, (ECF No. 47-6 at
8  17).

9  The third way products are sold is through a "feed" to Amazon and eBay. (Id.
10 at 10, 14.) This method involves CafePress's marketing department providing content
11 to Amazon and eBay regarding certain products, which are then sold through those
12 companies. (Id.)

13 To aid in its sales, CafePress contracts with a company that provides "re-
14 targeted" advertising. (ECF No. 47-4 at 12.) This involves the displaying of images
15 from the temporary cache memory of a computer used by an individual to browse
16 CafePress's website. (Id.; ECF No. 47-11.) Because images are displayed from the
17 cache of an individual's computer, neither CafePress nor the re-targeting company
18 record or track whether or which images are advertised. (ECF No. 47-4 at 13.)

19 Once products are ordered, most are printed by CafePress at its "state-of-the-art"
20 production facility in Kentucky. (ECF Nos. 47-1 at 1-2, 47-3 at 3.)

21 In his currently operative First Amended Complaint (FAC), Plaintiff alleges
22 CafePress and now-dismissed defendant Beverly Teall (Teall) infringed Plaintiff's
23 copyrights to an image entitled "Alaska Wildlife." (FAC ¶¶ 9-10.) "Alaska Wildlife"
24 was registered with the U.S. Copyright Office, effective November 24, 2012. (FAC,
25 Ex. A.)

26 Teall first uploaded the image that allegedly infringes "Alaska Wildlife" on
27 November 19, 2011. Using her own virtual shop, Teall first sold a product displaying
28 the allegedly infringing material on January 5, 2012—nearly a year before "Alaska

1  Wildlife" was registered with the U.S. Copyright Office. (Moore Decl. ¶ 29.)

2  Plaintiff thus alleges CafePress and Teall infringed Plaintiff's copyrights by, among other things, "(1) distributing various marketing materials containing designs identical to or substantially similar to [P]laintiff's copyrights; (2) selling or offering for sale various products containing designs identical or substantially similar to [P]laintiff's copyrights; (3) copying [P]laintiff's copyrights; (4) creating derivative works from [P]laintiff's copyrights; and (4) reproducing [P]laintiff's copyrights." (FAC ¶ 14.)

Based on the foregoing, Plaintiff asserts a single cause of action for copyright infringement under the Copyright Act, 17 U.S.C. § 101 et seq. (Id. ¶¶ 1, 9-17.) Plaintiff seeks the seizure and/or destruction of all products used to perpetrate the infringing acts, actual or statutory damages, injunctive relief, and attorney fees and costs. (Id. ¶ 17.)

It is undisputed that Plaintiff did not send any notice of infringement to CafePress before filing suit, and that CafePress first learned of Plaintiff's infringement allegations when CafePress received Plaintiff's initial Complaint. (Moore Decl. ¶ 28.) It is also undisputed that, on the same day CafePress received Plaintiff's initial Complaint, CafePress disabled access to the material that allegedly infringed "Alaska Wildlife." (Id. ¶ 29.)

CafePress explains in its Motion that, the day before the Early Neutral Evaluation Conference was held in this case on October 1, 2013, Plaintiff's counsel notified CafePress's counsel that "Plaintiff had identified three other works that allegedly were being infringed by users on [CafePress's] Website: 'Harmony of Wolves,' 'Find 12 Tigers,' and 'Polar Bears 10 Hidden Bears.'" (See ECF No. 15-1, CafePress Mot. at 6.) CafePress notes that, while Plaintiff has not identified these additional works in his FAC, CafePress "proceeds with this summary judgment motion as though these works had been included in the [FAC]." (Id. at 6 n.2.)

"Harmony of Wolves," "Find 12 Tigers," and "Polar Bears 10 Hidden Bears"

were each registered with the U.S. Copyright Office, effective January 20, 2013, December 14, 2012, and June 6, 2013, respectively. Allegedly infringing images of these additional works were found under the account of an individual CafePress has identified as "Second User."

Second User first uploaded the image that allegedly infringes "Harmony of Wolves" on November 18, 2008, and first sold a product displaying the material on December 10, 2011—more than a year before "Harmony of Wolves" was registered with the U.S. Copyright Office.

Second User first uploaded the image that allegedly infringes "Find 12 Tigers" on November 20, 2009, and first sold a product displaying the material on December 7, 2009—nearly three years before "Find 12 Tigers" was registered with the U.S. Copyright Office.

Second User first uploaded the image that allegedly infringes "Polar Bears 10 Hidden Bears" on November 5, 2008, and first sold a product displaying the material on November 30, 2008—more than four years before "Polar Bears 10 Hidden Bears" was registered with the U.S. Copyright Office.

It is undisputed that, on the same day counsel for CafePress learned of these additional allegedly infringing materials, CafePress disabled access to the materials. It is further undisputed that CafePress subsequently terminated Second User's account.

Before CafePress disabled access to the material that allegedly infringed Plaintiff's four copyrighted works, approximately $6,320 worth of products were sold. (ECF No. 47-4 at 54-68.) Of that amount, at least $77.22 worth of products was sold via Teall's and Second User's own virtual shops. At least $5,536.66 worth of products was sold through the CafePress Marketplace (whether accessed via computer or mobile device). And at least $510.61 and $59.50 worth of products were sold via Amazona and eBay, respectively.

/ / /

/ / /

## LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. The moving party may satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. Id. at 322-23.

If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

If the moving party meets the initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (internal quotations omitted). "Disputes over irrelevant

1  or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec.
2  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

3      The court may not make credibility determinations, and inferences to be drawn
4  from the facts must be viewed in the light most favorable to the party opposing the
5  motion. Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); see Anderson,
6  477 U.S. at 255; Matsushita, 475 U.S. at 587.

## DISCUSSION

8      CafePress argues it is entitled to summary judgment on the issue of infringement
9  pursuant to the safe-harbor defense provided under 17 U.S.C. § 512(c). Eligibility for
10 this affirmative defense, as set forth in the following paragraphs, involves at least three
11 layers of analysis with each layer having its own elements. The first layer requires
12 CafePress to demonstrate it is a "service provider" under 17 U.S.C. § 512(k). The
13 second layer requires a determination of whether CafePress satisfies the prerequisites
14 set forth in § 512(i). The third and final layer requires CafePress to satisfy the
15 requirements of § 512(c) itself.

16     Following discussion of CafePress's safe-harbor defense, the Court will address
17 CafePress's alternative request for partial summary judgment. CafePress argues in the
18 alternative that it is entitled to partial summary judgment on the issue of whether
19 Plaintiff's failure to register his copyrights before the alleged acts of infringement
20 commenced precludes Plaintiff from recovering statutory damages and attorney fees.

21     Finally, the Court will consider Plaintiff's request for additional discovery under
22 Federal Rule of Civil Procedure 56(d).

23 **I.  Safe Harbor**
24     **A.  "Service Provider"**
25     For purposes of § 512(c), "the term 'service provider' means a provider of online
26 services or network access, or the operator of facilities therefor." This is a broad
27 definition. In re Aimster Copyright Lit., 252 F. Supp. 2d 634, 658 (N.D. Ill. 2002)
28 ("'[S]ervice provider' is defined so broadly that we have trouble imagining the

existence of an online service that would not fall under the definition[]."). Indeed, the Ninth Circuit has observed that, under this definition, a service provider may go so far as to "modify user-submitted material to facilitate storage and access" while still falling under the definition. UMG Recordings, Inc. v. Shelter Capital Partners LLC, 718 F.3d 1006, 1019 (9th Cir. 2013). There are, however, limits to what an online service may do under the definition.

For example, an online service that directly sells, rather than facilitates the sale of, products likely falls outside the definition of a "service provider." See Hendrickson v. Amazon.com, Inc., 298 F. Supp. 2d 914, 915 (C.D. Cal. 2003) (finding copyright plaintiff had "no viable evidence establishing that Amazon was not merely an internet service provider . . . , but rather was the direct seller of the infringing item"); see also Wolk v. Kodak Imaging Network, Inc., 840 F. Supp. 2d 724, 730, 744 (S.D.N.Y. 2012) [concluding internet photo-sharing service (Photobucket) was a "service provider" where it provided an online platform for users to post material, which users could also print through a third-party (KODAK Gallery) pursuant to an agreement between the photo-sharing service and the third-party].

Here, while CafePress is an e-vendor similar to Amazon, eBay, and Photobucket, CafePress's business varies somewhat from these other entities. The largest difference is that CafePress goes beyond facilitating the sale of products between internet users by directly selling products to online shoppers through the CafePress Marketplace. Indeed, CafePress's policy of determining retail prices for products sold through the Marketplace and paying users only a royalty or commission for the sale of their products highlights the fact that CafePress has gone beyond operating a service that merely facilitates the exchange of information between internet users. As such, the Court cannot say, as a matter of law, that CafePress is a "service provider."

**B.     17 U.S.C. § 512(i)**

Before a service provider is eligible for entrance into § 512(c)'s safe harbor, certain conditions of eligibility must be met: (1) the service provider must have

"adopted and reasonably implemented" a copyright infringement policy that provides for the termination of "repeat infringers"; and (2) the service provider must accommodate and not interfere with "standard technical measures." 17 U.S.C. § 512(i)(1).

"Standard technical measures" means technical measures that: (1) are "used by copyright owners to identify or protect copyrighted works"; (2) "have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process"; (3) "are available to any person on reasonable and nondiscriminatory terms"; and (4) "do not impose substantial costs on service providers or substantial burdens on their systems or networks." 17 U.S.C. § 512(i)(2). An example of interfering with "standard technical measures" might entail a service provider that "'advises or encourages' users to conceal a work's copyrighted status." Obodai v. Demand Media, Inc., 2012 WL 2189740, at *5 (S.D.N.Y. June 13, 2012) (quoting Wolk, 840 F. Supp. at 745).

Here, Plaintiff does not dispute that CafePress has "adopted and reasonably implemented" a copyright infringement policy that provides for the termination of "repeat infringers." Rather, Plaintiff contends CafePress does not accommodate and/or interferes with "standard technical measures" because, when images are uploaded to CafePress's website, metadata regarding the image's copyright information is deleted.

CafePress responds that, while metadata may be deleted when an image is uploaded, it is deleted as part of the automated process for uploading images. CafePress asserts that, in any event, Plaintiff has offered no evidence that using metadata as a copyright protection tool has been "developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process."

Here, the Court finds that, at a minimum, Plaintiff has offered sufficient evidence to create a dispute of material fact as to whether CafePress's deletion of metadata when a photo is uploaded constitutes the failure to accommodate and/or interference with

1  "standard technical measures." From a logical perspective, metadata appears to be an
2  easy and economical way to attach copyright information to an image. Thus, a sub-
3  issue is whether this use of metadata has been "developed pursuant to a broad
4  consensus of copyright owners and service providers." Accordingly, the Court cannot
5  conclude, as a matter of law, that CafePress has satisfied the prerequisites of § 512(i).

### C.    17 U.S.C. § 512(c)

If an online entity is a "service provider" that has satisfied the prerequisites of § 512(i), the entity may be eligible for protection from copyright infringement liability under § 512(c).

Section 512(c) provides that a "service provider" shall not be liable for monetary or (except under certain circumstances) injunctive or other equitable relief "**by reason of the storage** at the direction of a user of [infringing] material that resides on a system or network controlled or operated by or for the service provider" under certain circumstances: (1) the service provider does not have actual **knowledge** of infringement or of facts making infringement apparent; (2) where the service provider has the "**right and ability to control**" the activity of its users, the service provider "does not receive a **financial benefit** directly attributable to the infringing activity"; (3) upon receipt of a statutorily compliant notice of claimed infringement, the service provider "**responds expeditiously** to remove, or disable access to, the material"; and (4) the service provider has **designated an agent** to receive statutorily compliant notices of claimed infringement. 17 U.S.C. §§ 512(c)(1) & (2).

Plaintiff does not dispute that CafePress responded expeditiously to disable access to the allegedly infringing material at issue in this case once it became aware of Plaintiff's allegations. Neither does Plaintiff dispute that CafePress has designated an agent to receive infringement notices. The Court thus addresses the remaining elements for application of § 512(c).

### 1.    "by reason of the storage"

Plaintiff does not dispute that images are initially uploaded, and therefore stored,

at the direction of users. Plaintiff contends, however, that CafePress is not entitled to the safe-harbor defense as to its non-storage related activities. The Ninth Circuit, however, has rejected the argument that non-storage activities are per se excluded from the safe-harbor protection.

The phrase "by reason of the storage at the direction of the user" creates a "but for" causation requirement. See Shelter Capital Partners LLC, 718 F.3d at 1018 n.7 (citing cases in which courts have concluded that "by reason of" should be read to require only "but for" rather than proximate causation). That is, a service provider may be exempt from infringement liability for activities that it otherwise could not have undertaken "but for" the storage of the infringing material at the direction of one of its users. See id. The Ninth Circuit thus recognized that the safe-harbor may apply to activities that go beyond the mere storage of infringing material. This interpretation does not, however, give a service provider free rein to undertake directly infringing activities merely because it allows users to upload content at will. A service provider may not, for example, "actively participate in or supervise file uploading . . . [or] preview or select the files before the upload is complete." Id. at 1020.

Here, the Court finds CafePress's Marketplace activities preclude summary judgment. Of most importance is CafePress's policy of determining, "in its sole and absolute discretion" which images are sold through the Marketplace. Also important is CafePress's ability to modify designs on products sold through the Marketplace, along with the fact that CafePress sets the retail prices for products sold through the Marketplace, paying only a royalty or commission to the users from whose shops the products came. (ECF No. 47-7.) Moreover, with regard to CafePress's "feed" activities, it is clear that CafePress itself chooses which products are fed to Amazon and eBay. Because these activities go beyond facilitating the storage and access of the allegedly infringing materials, the Court cannot conclude, as a matter of law, that CafePress undertook these activities "by reason of" Teall and Second User uploading images that allegedly infringe Plaintiff's copyrights.

### 2. "knowledge"

A service provider falls within § 512(c)'s safe harbor so long as it does not have actual knowledge of infringement or knowledge of facts which make infringement apparent. "[M]erely hosting a category of copyrightable content . . . with the general knowledge that one's services could be sue to share infringing material, is insufficient to meet the actual [and apparent] knowledge requirement[s]." Id. at 1022-23. The Ninth Circuit has explained that the burden of identifying copyright infringement is on the copyright holder, not the service provider. Id.. Thus, a service provider will not be deemed to have apparent knowledge of infringement unless it is shown that the service provider was aware of "red flags" that signaled "specific instances of infringement." Id.; Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1114 (9th Cir. 2007).

Here, Plaintiff does not dispute that CafePress did not have actual knowledge of infringement. Plaintiff contends, however, that CafePress had apparent knowledge of infringement because, in 2011, CafePress received an infringement notice from a third-party regarding material on Second User's account. Plaintiff asserts he "is limited on his ability to set forth facts regarding [CafePress]'s knowledge" because CafePress has produced some but not all of its files regarding Teall and Second User. Plaintiff asserts this additional discovery forms the basis of his Rule 56(d) request and that he plans to file several discovery motions with the magistrate judge to obtain this additional discovery.[1]

Here, Plaintiff has failed to offer sufficient evidence to create an issue of material fact as to CafePress's apparent knowledge of the specific instances of infringement at issue in this case. An unrelated infringement notice regarding materials on Second User's account is insufficient. CafePress's evidence that it had no actual or apparent knowledge of infringement is therefore unrebutted.

---

[1] Magistrate Judge Adler denied Plaintiff's discovery motions without prejudice and stayed discovery pending determination of the instant Motion. (ECF No. 43.)

### 3. "financial benefit . . . right and ability to control"

With regard to the requirement that the service provider not receive a "financial benefit directly attributable to the infringing activity" where the service provider has a "right and ability to control such activity," the Ninth Circuit has explained that the a service provider receives a direct financial benefit where "the infringing activity constitutes a draw for subscribers, not just an added benefit." Perfect 10, Inc., 488 F.3d at 1117 (quotation & citation omitted). Thus, summary judgment would be appropriate where "the record lacks evidence that [the service provider] attracted or retained subscriptions because of the infringement or lost subscriptions because of [the service provider's] eventual obstruction of the infringement." Id. at 118 (quotation & citation omitted).

Here, Plaintiff has offered no evidence that the instances of alleged infringement in this case constituted a draw for subscribers—i.e., attracted or retained subscriptions because of the infringement or lost subscriptions because of CafePress's eventual obstruction of infringement. To the contrary, the undisputed evidence demonstrates that CafePress deterred infringement. In line with its anti-infringement policies, CafePress terminated Second User's account after it became aware that Second User had, for the second time, uploaded allegedly infringing materials. Thus, to the extent that CafePress is a "service provider," summary judgment is appropriate on the issue of whether CafePress received a direct financial benefit. Still, to the extent that CafePress engaged in non-"service provider" activities, as set forth above, it may be that CafePress received a financial benefit from the sale of allegedly infringing products in the CafePress Marketplace and through its "feeds." Therefore, the Court cannot conclude at this time, as a matter of law, that CafePress received no financial benefit from the allegedly infringing activities at issue in this case.

The "right and ability to control," means the service provider must "exert substantial influence on the activities of users." UMG Recordings, 718 F.3d at 1030 (quoting Viacom Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 38 (2d Cir. 2012)).

1  "'Substantial influence' may include . . . high levels of control over activities of users
2  . . . . [o]r it may include purposeful conduct." UMG Recordings, 718 F.3d at 1030.

3  In Henrickson v. eBay, Inc., for example, the Central District of California
4  indicated that eBay did not have the "right and ability to control" allegedly infringing
5  material because it was not "actively involved in the listing, bidding, sale and delivery
6  of any item offered for sale on its website." 165 F. Supp. 2d 1082, 1094 (C.D. Cal.
7  2001); see also Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090, 1110 (W.D.
8  Wash. 2004) (concluding Amazon did not have "right and ability to control" because
9  Amazon did not edit product descriptions, suggest prices, or otherwise involve itself
10 in sales); Hendrickson v. Amazon.com, Inc., 298 F. Supp. 2d 914, 918 (C.D. Cal. 2003)
11 (concluding Amazon did not have "right and ability to control" where Amazon never
12 physically possessed the allegedly infringing material and was not actively involved
13 in the listing, bidding, sale or delivery of the material).

14 Here, the facts demonstrate CafePress is actively involved in the listing, sale,
15 manufacture, and delivery of items offered for sale in its Marketplace. This may be the
16 type of "purposeful conduct" that would provide CafePress with the "right and ability
17 to control" the allegedly infringing activity. As such, the Court cannot conclude, as a
18 matter of law, that CafePress did not have the "right and ability to control" the
19 allegedly infringing activity.

20 Having applied § 512(c)'s elements to the facts of this case, the Court concludes
21 CafePress is not entitled to summary judgment on its safe-harbor defense under §
22 512(c). The Court thus proceeds to CafePress's alternative request.

23 **II.   CafePress's Alternative Request Partial Summary Judgment**

24 CafePress alternatively requests partial summary judgment on Plaintiff's
25 entitlement to statutory damages and attorney fees because Plaintiff did not register his
26 works before the alleged infringement of Plaintiff's works commenced.

27 In response, Plaintiff argues he is entitled to statutory damages and attorney fees
28 for the acts of infringement occurring after registration because CafePress's post-

registration activities are of a different "type" than its pre-registration activities.[2] Plaintiff asserts, for example, that CafePress engaged in five different types of infringement of "Alaska Wildlife" by printing infringing material on wall clocks, a calendar, a framed tile, a throw pillow, and a journal.

Generally, a copyright plaintiff is barred from recovering statutory damages and attorney fees "for any infringement of copyright in an unpublished work commenced before the effective date of its registration" or "any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412. "Infringement 'commences' for the purposes of § 412 when the first act in a series of acts constituting continuing infringement occurs." Derek Andrew, Inc. v. Poof Apparel Corp., 528 F.3d 696, 700-01 (9th Cir. 2008) (quotation & citation omitted). In Derek Andrew, Inc., the Ninth Circuit determined that the pre- and post-registration distribution of garments bearing an infringing hang-tag constituted a "series of acts" even though the infringing hang-tag was attached to different garments. Id.

Here, Plaintiff has failed to offer evidence that would create a dispute of material fact with regard to the application of § 412. Each of the allegedly infringing images were uploaded to CafePress's website, printed, and sold at least once before Plaintiff registered his works. A product bearing the image that allegedly infringes "Alaska Wildlife" was first sold on January 5, 2012; "Alaska Wildlife" was not registered until November 24, 2012. A product bearing the image that allegedly infringes "Harmony of Wolves" was first sold on December 10, 2011; "Harmony of Wolves" was not registered until January 20, 2013. A product bearing an image that allegedly infringes

---

[2] In support of his position, Plaintiff relies on Guillot-Vogt Assocs. Holly & Smith, 848 F. Supp. 682, 691 (E.D. La. 1994). The district court there, however, did not hold that post-registration infringement of a "type" different than pre-registration infringement saves a plaintiff from application of the rule that a plaintiff is barred from recovering statutory damages and attorney fees. Rather, viewing the issue in the light most favorable to the plaintiff, the court merely declined to dismiss the plaintiff's claim for statutory damages and attorney fees, finding that the plaintiff's "type" argument "appears to be technically correct," albeit unsupported by case law.

1  "Find 12 Tigers" was first sold on December 7, 2009; "Find 12 Tigers" was not
2  registered until December 14, 2012.  A product bearing an image that allegedly
3  infringes "Polar Bears 10 Hidden Bears" was first sold on November 30, 2008; "Polar
4  Bears 10 Hidden Bears" was not registered until June 6, 2013.

5        Given that the alleged acts of infringement commenced before Plaintiff
6  registered his copyrights, the only issue is whether Defendants engaged in the same
7  "series of acts" pre- and post-registration.  In that regard, the Court is unpersuaded by
8  Plaintiff's argument that printing the allegedly infringing images on different products
9  constitutes different "types" of infringement.  The Court finds the various products
10 onto which the infringing images were printed are akin to the various garments to
11 which the defendant in <u>Derek Andrew, Inc.</u> attached the infringing hang-tags.  The
12 Court thus concludes the alleged acts of infringement in this case constitute the same
13 "series of acts" that commenced prior to Plaintiff's registration of his four works.
14 Accordingly, the Court finds it appropriate to grant summary judgment in CafePress's
15 favor on the issue of Plaintiff's entitlement to statutory damages and attorney fees.

16 **III.**  **Plaintiff's Rule 56(d) Request**

17       Plaintiff requests an opportunity to take additional discovery "in light of
18 [CafePress]'s refusal to comply with discovery related to [CafePress]'s DMCA
19 defense."  Setting aside the procedural defects of Plaintiff making a Rule 56(d) request
20 in his Opposition to CafePress's Motion, the Court will deny Plaintiff's Rule 56(d)
21 request as moot because, as set forth above, the Court will deny CafePress's Motion.

22       **CONCLUSION & ORDER**
23       Based on the foregoing, **IT IS HEREBY ORDERED** that:
24     1.    CafePress's Motion for Summary Judgment is **DENIED**;
25     2.    CafePress's Alternative Motion for Partial Summary Judgment is
26         **GRANTED**;
27     3.    Plaintiff's Rule 56(d) request is **DENIED** as moot; and
28 ///

4. The hearing on CafePress's Motion, currently set for February 28, 2014, is **VACATED**.

DATED: February 26, 2014

HON. GONZALO P. CURIEL
United States District Judge